

_____
Honorable Bruce A. Markell
United States Bankruptcy Judge

**Entered on Docket**
**April 09, 2013**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

| | | |
|---|---|---|
| In re: | ) | Case No.: BK-S-11-29783-BAM |
| | ) | |
| DEBRA PHILLIPS, | ) | Chapter 13 |
| | ) | |
| Debtor. | ) | Date:        September 26, 2012 |
| | ) | Time:        9:30 a.m. |
| | ) | Courtroom:   3 |

**OPINION OVERRULING OBJECTION TO PROOF OF CLAIM AND GRANTING RELIEF FROM THE
AUTOMATIC STAY**

I.      FACTS..................................................................... 3
        A.      The Home Loan................................................. 3
        B.      The Bankruptcy Proceedings................................... 4
                1.      The Proof of Claim and the Objection................. 4
                2.      The Second Allonge................................... 5
                3.      The Motion for Relief from Stay and the Opposition... 5
                4.      The Evidentiary Hearing.............................. 7

II.     DISCUSSION.............................................................. 7
        A.      Relationship Among the Parties, and the Role of Constructive Possession.... 7
        B.      Phillips's Arguments.......................................... 12
                1.      Standing — Phillips's Articulation of the Legal Standard........... 13
                2.      Alleged Infirmities with the Note................... 14
                3.      Alleged Infirmities with the Deed of Trust.......... 14
                4.      Prima Facie Validity of the Proof of Claim.......... 14
        C.      Seterus's Arguments........................................... 15
                1.      Standing............................................ 15
                2.      Prima Facie Validity of the Proof of Claim.......... 16
                3.      Cause to Grant Relief from Stay..................... 16
        D.      Resolution of the Parties' Arguments.......................... 17
                1.      Standing............................................ 17
                2.      The Substantive Law—Article 3 of the UCC............ 17
                        a.      The Requirement of a "Person Entitled to Enforce" the Note.. 18
                        b.      Validity of the Endorsement [Herein of Vera Logvynets's Signature]........... 23
                3.      The Relief from Stay Motion......................... 26
                4.      Whether the Claim is Secured........................ 27

III.    CONCLUSION............................................................. 32

I.    **FACTS**

   A.    **The Home Loan**

   On August 20, 2007, debtor Debra Phillips executed a promissory note (the "Note").  The Note was in the principal amount of $377,910 and called for monthly payments of $2,357.67.  Prem Mortgage, Inc. ("Prem Mortgage") was the named payee.  Phillips incurred this debt to finance the purchase of a home in Henderson, Nevada (the "Property").

   To secure her obligations under the Note, Phillips also executed a deed of trust encumbering the Property (the "Deed of Trust").  The Deed of Trust identified Prem Mortgage as the lender, but nominated Mortgage Electronic Registration System, Inc. ("MERS") as the beneficiary.[1]

   On July 1, 2010, Seterus, Inc. ("Seterus") obtained servicing rights to the Note as the agent of Federal National Mortgage Association ("Fannie Mae").  (Hr'g Tr. 82:10–12; 97:10–14.)  Sometime before that date, Prem Mortgage endorsed the Note to the order of AmTrust Bank ("AmTrust") and AmTrust then endorsed it to the order of Fannie Mae.  (*Id.* at 121:24–122:5; Seterus Ex. B at 4.)  The signatory of both endorsements was Vera Logvynets, identified as an authorized agent for both Prem Mortgage and AmTrust.  (Seterus Ex. B at 4.)  These two endorsements are on the same page, known as the "First Allonge." (*Id.*)

   On August 2, 2011, MERS executed a "Corporation Assignment of Deed of Trust" in favor of Fannie Mae (the "Assignment").  (Seterus Ex. C.)  The Assignment was recorded on August 26, 2011.  (*Id.*)  It assigned to Fannie Mae:

   > all beneficial interest under that certain Deed of Trust dated August 20, 2007 executed by Debra S. Phillips, Single Woman[,] Trustor, to Ticor Title[,] Trustee, and recorded as Instrument No. 0000424 on August 27, 2007, in book 20070827, page __ [*sic*], of Official Records in County Recorder's office in Clark County, Nevada, describing land therein as:
   >
   > AS DESCRIBED ON SAID DEED OF TRUST REFERRED TO HEREIN. TOGETHER all rights accrued or to accrue under said Deed of Trust.

---

[1] "MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns.  MERS is the beneficiary under this Security Instrument."  (Seterus Ex. A at 2.)

3

1    (*Id.*)

2    The Assignment also conveyed the beneficial economic interest in the Note to Fannie Mae.

3    *See Edelstein v. Bank of N.Y. Mellon*, 286 P.3d 249, 258, 260 (Nev. 2012).[2]

4    **B.    The Bankruptcy Proceedings**

5    On December 30, 2011, Phillips filed for bankruptcy under Chapter 13 of the Bankruptcy

6    Code.[3]   On her Schedule D, she listed Seterus as a "disputed" creditor with a secured claim of

7    $388,094 for the first mortgage on the Property.   On Schedules A and D, she listed the Property's

8    value as $385,000.[4]

9    ***1.    The Proof of Claim and the Objection***

10    On January 30, 2012, Seterus, acting as Fannie Mae's servicing agent, filed a proof of claim

11    in the amount of $362,687.98 (the "Proof of Claim").   (P.O.C. No. 3-1.[5])   Seterus did not attach a

12    copy of the Note or Deed of Trust to the Proof of Claim.

13    On May 1, 2012, four months later and after Seterus had filed its motion for relief from stay

14    (Dkt. No. 18), Phillips objected to the proof of claim.   (Dkt. No. 33.)   On May 17, Seterus filed its

15    response, to which it attached copies of (i) the Deed of Trust; (ii) the Assignment; (iii) the Limited

16

17    [2]In *Edelstein*, the Nevada Supreme Court held that the assignment of the beneficial interest in a

18    Deed of Trust also effectuates a "transfer" of the associated promissory note if the language of the Deed of Trust purports to make an assignment of the note. 286 P.3d at 260.  This court understands *Edelstein*'s use

19    of  "transfer" in the broad sense to refer to the conveyance of a property interest, rather than the UCC's narrower definition as the delivery of a negotiable instrument for the purpose of conveying the right to

20    enforce the instrument.  U.C.C. § 3-203 (2002); NEV. REV. STAT. § 104.3203 (2011).

21    [3]All "Chapter" and "Section" references are to the United States Bankruptcy Code, 11 U.S.C.

22    §§ 101–1532 (2012).

23    [4]In its post-hearing brief, Seterus incorrectly asserts that Phillips listed the fair market value as

24    $187,000 on her Schedule A.  (Dkt. No. 77 ¶ 54.)  Seterus likely took this number from the "Zillow" estimate in a nearly identical amount ($187,100) that it attached to its Motion for Relief from Stay.  (Dkt.

25    No. 18, Ex. 5.)

26    [5]"P.O.C. No." refers to the proof of claim number in the claims registry for claims filed

    electronically through the CM/ECF system.

Power of Attorney by Fannie Mae granting Seterus various servicing powers (the "Power of Attorney"); (iv) the Note; and (v) the First Allonge.  (Dkt. No. 39.)

On May 25, 2012, Phillips replied, with the following attached exhibits: (i) MERS System Procedures Manual, Transfer of Beneficial Rights, Overview, Feb. 27, 2012; (ii) MERS System Procedures Manual, Transfer of Beneficial Rights, Overview, Draft, undated;[6] and (iii) MERS System Terms & Conditions.  (Dkt. No. 44.)

### 2.    The Second Allonge

Sometime after the bankruptcy filing, on Fannie Mae's behalf, Seterus generated the "Second Allonge"—a single page containing only an endorsement in blank signed by Fransiska Somadi, a "Loan Administration Vice President" for Seterus.  (Seterus Ex. B at 4; Hr'g Tr. 105:8–9, 127:23–129:1.)  Seterus did not produce the Second Allonge until the Evidentiary Hearing.  (*See* Hr'g Tr. 119:5–8.)

### 3.    The Motion for Relief from Stay and the Opposition

On March 21, 2012, Seterus moved for relief from stay under Section 362(d).  (Dkt. No. 18.)  Seterus argued a lack of adequate protection—that Phillips was not making regular post-petition payments—and that she had no equity in the Property.  (*Id.* at 3.)  Seterus attached copies of (i) the Note; (ii) the First Allonge; (iii) the Deed of Trust; (iv) the Assignment; (v) a letter from Seterus to Max Default Services Corporation instructing it to record the included Deed of Trust and, once recorded, return the Deed of Trust to Seterus; (vi) a letter from Seterus's counsel to Phillips's prior counsel, Arun Gupta, informing Mr. Gupta that Phillips was in default and that Seterus intended to file a motion for relief from stay if Phillips did not timely cure the default; (vii) Phillips's Schedule A, which lists the Property's value as $385,000 and the amount of the

---

[6]In a declaration filed concurrently with Phillips's reply, Charles R. Powell, a paralegal for Phillips's counsel, stated that the draft version of this MERS document was set to take effect in June 2012. (Dkt. No. 46.)  Whether that version of the document was adopted by MERS is moot, however, because the parties stipulated to a copy of this MERS document at the Evidentiary Hearing on September 26, 2012. (Phillips Ex. B.)

secured claim as $388,094; (viii) Phillips's Schedule B; and (ix) an estimated valuation of the Property at $187,100 from the Zillow[7] website. (*Id.*) This motion marks the first time that Seterus produced copies of any of these documents—most importantly, the Note, First Allonge, and Deed of Trust.

On April 16, 2012, Phillips filed her opposition. (Dkt. No. 27.) She relied in part on an affidavit by William McCaffrey, a self-styled "securitization analyst" with many years in the lending business. (Dkt. No. 31.) The affidavit discussed alleged securitization of the Note, a topic which McCaffrey attempted to testify about at length during the Evidentiary Hearing. One month later, on May 16, Phillips amended her opposition. (Dkt. No. 37.) Several days later, Phillips filed another declaration by McCaffrey, which again alleged that the loan had been securitized. (Dkt. No. 45.)

On May 18, 2012, Seterus replied. (Dkt. No. 41.) The attached exhibits largely repeated previous submissions. (*See id.*) However, Seterus newly submitted a data sheet that appears to be from the Clark County assessor's office[8] showing the "total taxable value"of the Property in 2012–2013 as $175,306.[9] (Dkt. No. 41, Ex. L.)

---

[7]The court notes that Zillow "zestimates" are "inherently unreliable." *In re Darosa*, 442 B.R. 173, 177 (Bankr. D. Mass. 2010) ("Zillow is a participatory site almost like Wikipedia. Whereas Wikipedia allows anyone to input or change specific entries, Zillow allows homeowners to do so. A homeowner with no technical skill beyond the ability to surf the web can log in to Zillow and add or subtract data that will change the value of his property."). For the same reason, they are not admissible as a compilation. *See* FED. R. EVID. 803(17).

[8]The document is labeled "Clark County Real Property" and appears to be a printout from the "http://sandgate.co.clark.nv.us" website. (Dkt. No. 41, Ex. L.)

[9]Seterus also attached several cases to support its arguments that MERS has the legal authority to transfer promissory notes concurrently with deed of trust assignments and that Seterus was not required to produce the Note in order to move for relief from stay: *Davis v. US Bank, N.A.*, 2012 WL 642544 (Nev. 2012); *Miller v. Aurora Loan Services, LLC*, 2012 WL 1115363 (Nev. 2012); *Volkes v. BAC Home Loans Servicing, LP*, 2012 WL 642673 (Nev. 2012); *Thomas v. BAC Home Loans Servicing, LP*, 2011 WL 6743044 (Nev. 2011). (Dkt. No. 41, Exs. E–H.) Because Seterus produced the original Note at the Evidentiary Hearing, the court does not address whether a motion for relief from stay is valid without

### 4.    The Evidentiary Hearing

The court heard both matters at a consolidated evidentiary hearing on September 26, 2012 (the "Evidentiary Hearing"). At the hearing, Phillips called herself and McCaffrey[10] to testify. Seterus called Kathy Jolly, a "Bankruptcy Account Specialist" at Seterus.

At the hearing, the court did not admit Seterus's copy of the Note and two affixed alonges into evidence. The court, however, admitted a copy of the Note without the alonges, (Phillips Ex. H), and the original Note and both alonges. (Hr'g Tr. 9:13–11:5, 138:12–13.) Upon examination of the original Note and both alonges at the hearing, the court determined that it would treat Seterus Exhibit B as a fair and accurate representation of the original documents, a treatment to which Phillips's counsel did not object. (*See id.* at 90:9–92:25.)

The hearing lasted a half day. The parties submitted post-hearing briefs on November 1 and 2, 2012, and the matter was then deemed submitted for decision. (Dkt. Nos. 77, 79.)

## II.    DISCUSSION

### A.    Relationship Among the Parties, and the Role of Constructive Possession

There are a plethora of players here. It thus becomes important to sort them out, and to establish their various legal relations.

The primary focus is the Note. It is the source of value in this transaction, representing Phillips's promise to pay over $377,000. This promise initially ran in favor of Prem Mortgage, the

---

attaching a copy of the mortgage note. In *Edelstein*, the Nevada Supreme Court held that MERS has the authority to transfer promissory notes as "nominee" for the lender (and its successor and assigns), so long as the Deed of Trust grants MERS such authority. 286 P.3d 249, 258.

[10]The court allowed McCaffrey to testify as an expert to the extent he had knowledge, skill, experience, or training on the customs and practices in the securitization industry that might bear on the issues being tried. McCaffrey did not, however, have any personal knowledge as to the ownership and possession of the Note; he had never seen them. For this reason, and because the issue of ownership is a legal conclusion within the court's domain, the court did not permit McCaffrey to testify about that issue. *See* Fed. R. Evid. 702–703. In a prior unreported case with nearly identical facts, the court similarly ruled as to the extent of McCaffrey's expert qualifications. *In re Stanley*, No. 11-15621-BAM, Dkt. No. 73 at 5 n.8 (Bankr. D. Nev. Oct. 12, 2012).

1    initial payee on the Note, and its first holder.  Being a negotiable instrument,[11] however, that

2    promise was tradable and transferable according to the venerable rules of Article 3 of Nevada's

3    version of the Uniform Commercial Code.

4          The Note was the subject of many transactions.  The indorsements indicate that it passed

5    from Prem Mortgage to AmTrust to Fannie Mae.  As will be shown below, each of these

6    indorsements was accompanied by a negotiation—"a transfer of possession . . . of an instrument by

7    a person other than the issuer to a person who thereby becomes its holder."  Nev. Rev. Stat.

8    § 104.3201(1) (2011).  Fannie Mae's status as a "holder," through its agent, Seterus, is key to its

9    claim to be a "person entitled to enforce" the Note.  *Id.* § 104.3301(1).

10          When Phillips's case commenced, however, Seterus, and not Fannie Mae, had physical

11    possession of the Note.  Seterus held the Note as an agent of, and servicer for, Fannie Mae, a fact

12    established by the customs of the industry generally and the terms of the Power of Attorney

13

14

15    _____

16          [11]There is no dispute that the Note is a "negotiable instrument" within the meaning of Nev. Rev.
     Stat. § 104.3104.1, and thus is governed by Article 3 of Nevada's Uniform Commercial Code.

17          A "'negotiable instrument' means an unconditional promise or order to pay a fixed amount of
     money, with or without interest or other charges described in the promise or order, if it:

18                (a) Is payable to bearer or to order at the time it is issued or first comes into
          possession of a holder;

19                (b) Is payable on demand or at a definite time; and

20                (c) Does not state any other undertaking or instruction by the person promising or
          ordering payment to do any act in addition to the payment of money . . . ."

21    Nev. Rev. Stat. § 104.3104(1) (2011); *see Leyva*, 255 P.3d at 1280.

22          Under the UCC, sometimes the qualifier "negotiable" is dropped.  U.C.C. § 3-104(b) (2002)
     ("'Instrument' means a negotiable instrument."); *see* Nev. Rev. Stat. § 104.3104(2).

23          Even if it weren't a negotiable instrument, however, the evidence was such that it would be
     "appropriate, consistent with the principles stated in § 1-102(2) [now § 1-103], for a court to apply one or

24    more provisions of Article 3 to the writing by analogy, taking into account the expectations of the parties
     and the differences between the writing and an instrument governed by Article 3."  U.C.C. § 3-104 cmt. 2

25    (2002); *see also Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal)*, 450 B.R. 897, 909 n.14 (B.A.P. 9th
     Cir. 2010); Fred H. Miller & Alvin C. Harrell, The Law of Modern Payment Systems § 1.03[1][b]

26    (2003).

8

specifically.[12]

Possession, however, is a key element of being a holder.[13]  This raises the issue of whether possession as required by Article 3 can be possession by an agent of the person named in the indorsement—so called "constructive possession."  Both history and logic indicate that it can.

Historically, the propriety and ability of an agent to possess an instrument for its principal was explicit under the predecessor of Article 3, the Negotiable Instruments Law.  Section 2 of that law provided that "'[d]elivery means transfer of possession, actual or *constructive*, from one person to another.'" *See Irving Trust Co. v. Leff*, 171 N.E. 569, 571, 253 N.Y. 359, 363 (1930) (quoting N.I.L. § 2) (emphasis supplied).  As a consequence, delivery of an instrument, duly endorsed, to an agent sufficed to constitute delivery to the principal, making the principal the holder of the instrument.  *See, e.g.*, *Worth v. Case*, 42 N.Y. 362, 367 (1870); *Wolfin v. Security Bank of N.Y.*, 156 N.Y.S. 474, 170 A.D. 519 (N.Y. App. Div. 1915).

This reasoning applies under the current Uniform Commercial Code, as underscored by Comment 1 to the UCC's definition of negotiation: "[n]egotiation always requires a change in possession of the instrument because nobody can be a holder without possessing the instrument, either directly *or through an agent*." U.C.C. § 3-201 cmt. 1 (2002) (emphasis added). The reasoning for this position is examined in a leading treatise:

> As the UCC does not define "delivery" or "possession," the non-UCC

---

[12]Various holders of the Note had used other servicers before Seterus.  The record is unclear, but AmTrust was either the initial servicer on behalf of Prem Mortgage or serviced the Note in its own right upon the endorsement of the Note from Prem Mortgage to it.  In any event, AmTrust transferred the servicing rights to Chase Home Finance LLC ("Chase"), who then transferred them to JP Morgan Chase Bank, N.A. (also referred to as "Chase"), who appears to have transferred them to LBPS (Seterus's predecessor).  These various entities acted as servicers, or agents of, the Note's holders or owners.

[13]After commencement of the case, Fannie Mae and Seterus attempted to avoid the argument regarding Fannie Mae's lack of physical possession by having Seterus endorse the note in blank, thereby making anyone in possession of the Note—even a thief—its holder.  NEV. REV. STAT. § 104.3205(2) (2011).  But the Bankruptcy Code makes the date a case commences the focus in any claims objection proceeding.  11 U.S.C. § 502(b) (2012).

9

concept of delivery to an agent whose principal then has constructive possession remains in force, because not displaced.

Such possession required to qualify a person as a "holder" may be a constructive possession by delivery to another on that person's behalf. Thus, a person is a "holder" of a negotiable instrument when it is in the physical possession of his or her agent.

LARY LAWRENCE, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE § 1-201:265 (3d ed. 2012). *See also* RESTATEMENT (THIRD) OF AGENCY § 8.12 cmt. b (2006) ("An agent's possession or control of property on behalf of a principal is tantamount for many purposes to possession or control by the principal. For instances, see Uniform Commercial Code §§ 1–201(b)(21) (definition of "holder" of instrument and document of title), 3–203 (transfer of instrument), 3–301 (definition of "person entitled to enforce" an instrument), 8–104(a)(1) (when a certificated security is acquired), 8–106(d) (definition of "control" of securities account), 8–301(a)(2) (definition of "delivery of a security"), 9–104 (definition of "control" of deposit account), 9–106 (definition of "control" of investment property).").

*Corporacion Venezolana de Fomento v. Vintero Sales Corporation* sets forth the logic behind this position:

The U.C.C. defines delivery as the "voluntary transfer of possession." U.C.C. § 1-201(14). It does not specify, however, whether delivery may be either "actual" or "constructive." Under § 2 of New York's former Negotiable Instruments Law (in effect prior to the adoption of the U.C.C.), "delivery" was defined as the "transfer of possession, actual or constructive, from one person to another." There appears to be general agreement that since the U.C.C. does not prescribe any new definition of the term, the definition of "delivery" under the prior law should be deemed to continue. *See, e.g.*, *Billingsley v. Kelley*, 261 Md. 116, 274 A.2d 113, 118–19 (1971); *Snyder v. Town Hills Motors, Inc.*, 193 Pa.Super. 578, 165 A.2d 293, 294–95 (1960); *2 Anderson, The Uniform Commercial Code* § 3-102:8 at 588 (2d ed. 1971). . . . Under the law of New York, constructive delivery may be accomplished through the vehicle of an agent.

452 F. Supp. 1108, 1117 (S.D.N.Y. 1978); *see also Midfirst Bank, SSB v. C.W. Haynes & Co., Inc.*, 893 F. Supp. 1304, 1314–15 (D.S.C. 1994); *Bankers Trust (Del.) v. 236 Beltway Inv.*, 865 F. Supp. 1186, 1194 (E.D. Va. 1994): *Georg v. Metro Fixtures Contractors, Inc.*, 178 P.3d 1209, 1213–14 (Colo. 2008); *Billingsley v. Kelly*, 274 A.2d 113, 117-19, 261 Md. 116, 123-26 (1971); *Lazidis v.*

10

1   *Goidl*, 564 S.W.2d 453, 455 (Tex. Civ. App. 1978) ("[A] person may be the owner and holder of a

2   note when the note is held by an authorized agent of the owner.").

3          To the extent that *Kemp v. Countrywide Home Loans, Inc. (In re Kemp)*, 440 B.R. 624

4   (Bankr. D.N.J. 2010), is to the contrary, this court declines to follow it.  In *Kemp*, Countrywide had

5   originated mortgage notes and was in possession of them at the time of the debtor's bankruptcy.

6   The notes, however, had been endorsed to Bank of New York as Trustee, but the bank had never

7   taken possession from Countrywide.  The debtor objected on the grounds that Bank of New York

8   was not a holder because it was not in actual, physical possession of the notes.

9          Despite assuming that Countrywide was Bank of New York's authorized servicer for the

10  notes, *id.* at 629 n.8, the court held that Countrywide's failure to transfer possession of the notes to

11  Bank of New York was fatal to Bank of New York's standing as a holder.  "Because the Bank of

12  New York never had possession of the note, it can not qualify as a 'holder' under the New Jersey

13  UCC."  *Id.* at 630.

14         As shown above, this conclusion is contrary to the history of negotiable instruments

15  generally, and the present provisions of the Uniform Commercial Code specifically.  The sole case

16  *Kemp* relied upon, *Dolin v. Darnall*, 181 A. 201, 115 N.J.L. 508 (N.J. 1935), is also inapposite.

17  *Dolin* dealt with a person's expectancy to be a holder; it held that one who had a right of

18  possession, without consideration of agency principles, was not a holder without actual possession.

19  Indeed, *Dolin* recognized exceptions to the actual possession rule, including when the instrument

20  was pledged to another and when the equitable principles of an assignee of the instrument by

21  separate instrument dictated the contrary.  *Id.* at 205, 115 N.J.L. at 516.  Following *Dolin*'s logic, it

22  is difficult to distinguish an assignee's right to rely on his assignor's possession from the

23  principal's right to rely on her agent's possession.

24         Further, *Kemp* never addresses the status of delivery under the current Uniform Commercial

25  Code, as did *Vintero Sales Corp.* and the other cases cited above.  Nor does it mention the explicit

26  acknowledgment of the sufficiency of agency to establish possession set forth in Comment 1 to

11

1    UCC § 3-201.  In short, *Kemp* is not persuasive.  *See* David A. Pisciotta & Oscar N. Pinkas, Kemp

2    v. Countrywide: *Problem of Possession*, 30 AM. BANKR. INST. J. 20 (April 2011).

3        As a result, Seterus's possession of the Note raises no bar to Fannie Mae's enforcement.

4    Seterus's agency has not been questioned, nor has the fact that it holds the Note for its principal,

5    Fannie Mae.  As such, to the extent that the Note has been indorsed to Fannie Mae, its possession

6    by its agent Seterus would be sufficient to make Fannie Mae a holder.

7        With respect to rights under the Deed of Trust, the Assignment conveyed the beneficial

8    interests under the Deed of Trust to Fannie Mae, and this occurred before Phillips commenced her

9    case.  Seterus, as Fannie Mae's agent, can rely on this fact in asserting that Fannie Mae's claim is

10   secured by the Deed of Trust so assigned.[14]

11       The relations of the relevant parties are thus as follows: Seterus is Fannie Mae's agent, and

12   the servicer of the Note on Fannie Mae's behalf.  The Note is physically held by Seterus, but held

13   as Fannie Mae's agent, and not in any individual capacity.  Fannie Mae is the current beneficiary

14   under the Deed of Trust, and the owner of all equitable interests in the Note.  Seterus has standing

15   as Fannie Mae's agent to assert that the Note is secured in Fannie Mae's favor.  With these

16   relationships in mind, we can move to the parties' contentions and responses.

17       **B.    Phillips's Arguments**

18       Phillips's principal contention is that the Note and Deed of Trust have been "split" from

19   each other—that the owners of the relevant interests in the Note and Deed of Trust were different

20   when the Proof of Claim was filed, or that if they were the same entity then prior ownership by

21   different entities effectuated an irreparable separation of the Note from the Deed of Trust.  To

22   support this position, she contends (i) various infirmities with the conveyances of the Note and

---

[14]The validity of the Second Allonge is irrelevant for the purposes of the instant matter because Seterus acted at all times as Fannie Mae's authorized agent.  The court does not determine whether the endorsement on the Second Allonge is invalid or whether the allonge otherwise fails to comply with Article 3 of the UCC, as adopted in Nevada.  *See* NEV. REV. STAT. §§ 104.3101–104.3605 (2011).

12

Deed of Trust; (ii) that two MERS boilerplate documents evince an intention by the parties to split the Note and Deed of Trust and disallow reunification; and (iii) that MERS did not have the authority to transfer the Note concurrently with the Assignment.  (Dkt. No. 79 at 11–14.)

Because of this "split," Phillips argues, Seterus does not have standing to prosecute a proof of claim or seek relief from the automatic stay.  She also argues that the "split" rendered "the debt unenforceable against [Phillips] and her property," an argument the court interprets to be that the debt is, at most, unsecured.[15]  (*Id.* at 12.)  Lastly, Phillips argues that the Proof of Claim is not prima facie valid under Rule 3001.  (*Id.* at 6.)

To the extent that it is necessary or helpful, the court expands on these arguments, context for which is provided by Phillips's articulation of the legal standard for standing.

### *1.    Standing — Phillips's Articulation of the Legal Standard*

Phillips contends that "[t]o prove standing, an alleged Creditor must show that it is the holder of *both* the Debtor's promissory Note *and* a Deed of Trust.  (Dkt. No. 79 at 7 (citing Edelstein, 286 P.3d at 255) (emphasis by Phillips).)[16]  Under this premise, she argues that any invalid conveyance of the Note or Deed of Trust to Fannie Mae and/or Seterus deprives Seterus of standing.[17]

---

[15]Any infirmities with the Deed of Trust, which only operates as a security instrument, do not affect the enforceability of the associated debt obligation.  *See* NEV. REV. STAT. § 104.3301(1) (2011) (entitlement to enforce negotiable instrument not dependent on existence or validity of a security instrument); *Edelstein*, 286 P.3d at 259 ("Separation of the note and security deed . . . does not render either instrument void."); RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 5.4 cmt. a (1997) ("When the right of enforcement of the note and the mortgage are split, the note becomes, as a practical matter, unsecured.").

[16]Phillips erroneously articulated the requirements for standing to *foreclose* in Nevada, rather than to prosecute a proof of claim and move for relief from the automatic stay in federal court.  *See Edelstein*, 286 P.3d at 255.  In the present context, when a note and deed of trust are "split," the result is not that the party seeking to enforce the note does not have standing, but rather that the note becomes unsecured.  *See infra* Section II.D.1.

[17]Although any argument that an invalid deed of trust assignment, in and of itself, renders the Claim invalid or deprives Seterus of standing to enforce the Note is incorrect as a matter of law, the court includes such arguments by Phillips to frame the discussion and provide guidance to future litigants who may face

### 2.    Alleged Infirmities with the Note

Phillips contends that Seterus does not possess the properly endorsed original Note on several grounds: (i) the Note was sold into a securitized mortgage trust (the "FNMA Trust")[18] and "is now and has been in the possession of the investors of the FNMA Trust since 2007[;]"[19] (ii) the Note's "chain of title" is broken because the First Allonge is not endorsed in blank and Chase is omitted from the chain of endorsements; (iii) the First Allonge was not properly affixed to the Note; and (iv) Vera Logvynets did not have proper written authority to endorse the Note. (*Id.* at 2–3, 7–10, 15.)

### 3.    Alleged Infirmities with the Deed of Trust

Next, she contends that the Deed of Trust was not properly assigned to Seterus because (i) the Assignment occurred after the closing date of the FNMA Trust; (ii) this type of trust does not hold or possess deeds of trust; and (iii) the terms of the Deed of Trust precluded its assignment. (*Id.* at 10–11.)

### 4.    Prima Facie Validity of the Proof of Claim

Finally, Phillips contends that the presumption of validity under Rule 3001(f) does not

the same factual scenario.

[18] The "Federal National Mortgage Association (Fannie Mae) Guaranteed Remic Pass-Through Series 2007-111." (Dkt. No. 79 at 8–9.)

[19] Rather confusingly, however, Phillips also states that "[h]ere, [Fannie Mae] is the owner of the Debtor's Note . . . But [BONY] is the Trustee of the securitized mortgage Trust that the Debtor's Note was sold to." (*Id.* at 10.) This confusion may demonstrate a misunderstanding of the difference between a holder and an owner of a negotiable instrument. She could be asserting that Fannie Mae is the purported endorsee under the First Allonge (but not the Note's holder because of her contention that the FNMA Trust possesses the Note, and not a proper endorsee because of infirmities with the First Allonge), and that the ownership interest was sold to the FNMA Trust. (*See id.* at 15.)

Alternatively, she may be arguing that Fannie Mae owns the economic interest in the Note and that the FNMA Trust possesses the Note. Under this framework, the FNMA Trust cannot be the holder because there is no endorsement to the FNMA Trust, and nor can Fannie Mae be the holder because it does not possess the Note. As discussed below, however, the nature of her confusion is irrelevant because Seterus has established that it is a party entitled to enforce the Note and thus has standing.

14

apply because the Proof of Claim was not filed with the supporting written documentation required by Rule 3001(c)(1). (*Id.* at 6.) Further, she seems to assert that the presumption of validity can never be established because Seterus failed to initially comply with Rule 3001(c)(1)—that attaching the necessary documents to a later filing, as Seterus did by filing the Motion for Relief from Stay with the Note and First Allonge attached, did not cure the defect.[20] (*See id.*) Consequently, so she argues, Seterus has the burden of proving that it has standing to enforce the debt.[21] (*Id.*)

### C.    Seterus's Arguments

#### 1.    Standing

Seterus responds by arguing that the Note and Deed of Trust have not been split and that it has standing as the "person entitled to enforce" the Note. (Dkt. No. 77 ¶¶ 1–3, 37 (citing *Veal v. Am. Home Mortg. Servicing, Inc. (In re Veal)*, 450 B.R. 897 (B.A.P. 9th Cir. 2011)).)

Seterus first asserts that it is the Note's holder because it possesses the original Note and because the First Allonge contains a special endorsement to Fannie Mae. (*Id.* ¶ 3.) Seterus argues that the First Allonge is valid because its regular course of business is to obtain possession of notes when servicing rights are assigned, which occurred here in July 2010, and because the First Allonge was executed before that date. (Dkt. No. 77 ¶¶ 17–18, 21; Hr'g Tr. 82:6, 121:19–23, 122:2–5.)

Seterus next contends that there is no extrinsic evidence to prove that the FNMA Trust closed before the Assignment, and that, according to McCaffrey's testimony, the "closing date" for a securitized trust is merely the date by which certain documents must be delivered to the trustee and that notes are regularly assigned to securitized mortgage trusts after that date. (Dkt. No. 77

---

[20]Notably, Seterus moved for relief from the automatic stay about six weeks before Phillips objected to the Proof of Claim. (Dkt. Nos. 18, 33.)

[21]Phillips misunderstands the consequences of failing to execute and file a proof of claim in accordance with the Rules. *See* FED. R. BANKR. P. 3001(f). Upon such failure, the presumption of validity does not arise. *Id.* The significance is only that the creditor must then prove the validity and amount of the claim. The standing inquiry precedes the issues of claim validity and amount, as any litigant seeking relief in federal court must prove that it has standing. *See infra* Section II.D.1.

1   ¶¶ 33–36.)

2       Regarding the Assignment of the Deed of Trust, Seterus cites *Edelstein* for the proposition

3   that MERS had express authority to concurrently transfer the Note with the Deed of Trust. (*Id.*

4   ¶¶ 42–43.) Seterus also argues under *Edelstein* that the Note and Deed of Trust were reunified in

5   Fannie Mae upon the Assignment and the special endorsement to Fannie Mae in the First Allonge.

6   (*See id.* ¶ 53.)

7                   ***2.    Prima Facie Validity of the Proof of Claim***

8       Seterus contends that attaching the Note and First Allonge to the "Secured Creditor's

9   Amended Proof of Claim" was sufficient to show prima facie evidence of the validity of the Claim

10  under Rules 3001(c) and (f).[22] (Dkt. No. 39 at 6.) Seterus further contends that Phillips cannot

11  object to the Proof of Claim because listing the Property in Schedule A and listing Seterus in

12  Schedule D as a secured creditor for the Property constitutes a stipulation that Seterus, as the

13  servicer for the Note, holds enforceable claims against Phillips.[23] (*Id.*)

14                  ***3.    Cause to Grant Relief from Stay***

15      On the merits, Seterus argues that there is cause to grant relief from stay under Section

16  362(d)(2) because its interest in the Property is not protected by an equity cushion and the

17  Property's fair market value is declining. (*Id.* ¶¶ 54–60.)

18

19

20      [22]While there is no "Secured Creditor's Amended Proof of Claim" on the docket or the claims
    register, the Motion for Relief from Stay (Dkt. No. 18, Mar. 21, 2012) did attach copies of the Note and

21  First Allonge.

22      [23]This argument is without merit. First of all, Phillips listed Seterus's claim as *disputed*. (Dkt. No.
    1 at 16.) Even if the claim were undisputed, however, Seterus's argument would still fail. While listing an

23  uncontested debt on a bankruptcy schedule can constitute an admission of that debt under the rules of
    evidence, debtors are not thereby precluded from objecting to a creditor's proof of claim on that debt. *See*

24  *Heath v. Am. Express Travel Related Servs. Co. (In re Heath)*, 331 B.R. 424, 431 (B.A.P. 9th Cir. 2005)
    (citing *In re Cluff*, 313 B.R. 323, 339–40 (Bankr. D. Utah 2004)); *see also In re Minbatiwalla*, 424 B.R.

25  104, 116–17 (Bankr. S.D.N.Y. 2010) (summarizing bankruptcy courts' differing treatments in the claims
    allowance process of debts scheduled as undisputed, none of which treat the scheduled debt as conclusively

26  establishing that the claim is allowed in cases other than those filed under Chapter 11).

1

**D.      Resolution of the Parties' Arguments**

2

       ***1.      Standing***

3

Standing is an important challenge; it is a "threshold question in every federal case,

4

determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498

5

(1975).  To establish its standing, a party must make the requisite showing under both

6

constitutional standing requirements and prudential standing principles.  *Elk Grove Unified Sch.*

7

*Dist. v. Newdow*, 542 U.S. 1, 11 (2004).

8

The Bankruptcy Appellate Panel of the Ninth Circuit has clarified how these prudential

9

limitations on standing apply to mortgage notes.  As stated by the Panel, a party seeking relief from

10

stay with respect to a mortgage note has standing if it has "a colorable claim to receive payment

11

pursuant to the Note, which it [can] accomplish either by showing it [is] a 'person entitled to

12

enforce' the Note under Article 3, or by showing that it [has] some ownership or other property

13

interest in the Note." *In re Veal*, 450 B.R. at 913.  With respect to standing to prosecute a proof of

14

claim, an entity must "show that it [is] a 'person entitled to enforce' the Note, or [is] the agent of

15

such a person." *Id.*

16

Common to both inquiries is the issue of whether the party is a "person entitled to enforce"

17

the Note, a concept found in Article 3 of the UCC.  Accordingly, Article 3 of the UCC as enacted

18

in Nevada provides the law regarding Seterus's standing as to the Note,[24] and whether Seterus can

19

seek relief from the automatic stay.

20

       ***2.      The Substantive Law—Article 3 of the UCC***

21

Under Nevada law, Article 3 provides the rules governing payment obligations arising

22

under a negotiable instrument[25] such as the mortgage note at issue here.  NEV. REV. STAT.

23

24

[24]If Seterus has standing as to enforcing the Note, it perforce has standing as to whether the Note is
secured, and secured by the Property, as deeds of trust and other security devices exist only to secure the

25

payment obligations under the related debt instrument.

26

[25]The Note is undoubtedly an Article 3 negotiable instrument.  *See supra* note 11.

§ 104.3102 (2011); *see Leyva v. Nat'l Default Servicing Corp.*, 255 P.3d 1275, 1279–80 (Nev. 2011) ("A mortgage note is a negotiable instrument, and any negotiation of a mortgage note must be done in accordance with Article 3."). It also supplies the rules for identifying the proper party to whom a note's maker[26] must make payment in order to satisfy and discharge the obligations under the note.

### a.  The Requirement of a "Person Entitled to Enforce" the Note

Under Article 3, unless the instrument indicates to the contrary, there is one, and only one, person that a note's maker need pay. *See* U.C.C. § 3-602(a) (2002) ("[A]n instrument is paid to the extent payment is made . . . to a person entitled to enforce the instrument."). Nevada law follows this requirement; a maker is discharged of his or her obligations under an instrument *only* to the extent that payment is made to a "person entitled to enforce" that instrument. NEV. REV. STAT. § 104.3602(1) (2011).[27]  In this way, Nevada law and Article 3 relieve a maker of an instrument from the need to know who owns the economic or beneficial interest in his or her obligation to pay.

Article 3 as adopted in Nevada defines a "person entitled to enforce" an instrument as "(a) The holder of the instrument; [or] (b) A nonholder in possession of the instrument who has the rights of a holder . . . ."[28]  *Id.* § 104.3301(1). Seterus thus must show that it is a holder of the Note, or a nonholder in possession of the Note who has the rights of a holder. *See Leyva*, 255 P.3d at 1280–81. The identity of the beneficiary of the Deed of Trust and the owner of the economic interest in the Note are irrelevant for the standing inquiry.

---

[26]The maker of a note is "a person who signs or is identified in a note as a person undertaking to pay." NEV. REV. STAT. § 104.3103(1)(d) (2011).

[27]There are exceptions not relevant here, such as when a thief steals a bearer instrument, and the maker knows that the person requesting payment is the thief. *Id.* § 104.3602(2).

[28]It also includes "(c) A person not in possession of the instrument who is entitled to enforce the instrument pursuant to NRS 104.3309 or subsection 4 of NRS 104.3418." *Id.* § 104.3301(1)(c). The cross references refer to lost or destroyed instruments. As the Note is in Seterus's possession, this third category of "person entitled to enforce" status is not relevant here.

The "holder" of a note is "[t]he person in possession of a negotiable instrument that is payable either to *bearer* or to an *identified person* that is the person in possession [of the note]."[29] NEV. REV. STAT. § 104.1201(2)(u)(1) (2011) (emphasis supplied). The reference in Section 104.1201(2)(u)(1) to "bearer or . . . an identified person" means to build on the fact that a note can be payable to bearer or payable to order. *Id.* § 104.3109; *see Leyva*, 255 P.3d at 1280. A note is payable to bearer if it "[s]tates that it is payable to bearer or to the order of bearer or otherwise indicates that the person in possession of the [note] . . . is entitled to payment." NEV. REV. STAT. § 104.3109(1)(a) (2011).

A note "that is not payable to bearer is payable to order if it is payable to the order of an identified person or to an identified person or order." *Id.* § 104.3109(2). Article 3 defines this "identified person" by reference to the order or direction of the maker of the instrument, or to orders or directions made by the persons to whom the instrument was negotiated. *See id.* § 104.3109. These orders or directions will appear from the chain of endorsements contained on the instrument; an "order" under Nevada's version of Article 3 is "a written instruction to pay money signed by the person giving the instruction." *Id.* § 104.3103(1)(e).[30] These written instructions normally take the form of the words "pay to" followed by an endorsement. An endorsement, in turn, is simply "a signature . . . that alone or accompanied by other words is made on an instrument for the purpose of . . . negotiating the instrument . . . ." *Id.* § 104.3204(1). As

---

[29]To determine whether a person is a "holder" then, the court must examine the actual note and any endorsements. *In re Veal*, 450 B.R. at 911.

[30]The use of "order" language is one of the primary distinctions between negotiable instruments and ordinary contracts. The words "or order" appearing after the name of the initial payee are often referred to as the "words of negotiability." U.C.C. § 3-104, cmt. 2 (2002) ("Words making a promise or order payable to bearer or to order are the most distinguishing feature of a negotiable instrument and such words are frequently referred to as 'words of negotiability.'") These simple words empower the payee to order the maker to pay another person so named. By such an "order," usually in the form of an endorsement, the payee thus transfers the instrument to another, who takes the instrument with the identical power to transfer to another by a similar "order."

1    stated in the comments to Section 3-109 of the UCC:

2          An instrument payable to order is payable to an identifiable person. . . . Thus, an
           instrument payable to order requires the indorsement of the person to whose order
3          the instrument is payable.

4    U.C.C. § 3-109 cmt. 1 (2002).[31]

5          In many cases, then, the issue is whether the signatures on an instrument were made for the

6    purpose of negotiating the instrument.[32]   A negotiation is the "transfer of possession, whether

7    voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby

8    becomes its holder."  NEV. REV. STAT. § 104.3201(1) (2011).  If a note is payable to "an identified

9    person, negotiation requires transfer of possession of the instrument *and* its endorsement by the

10   holder."  *Id.* § 104.3201(2) (emphasis added); *see also id.* § 104.3109; U.C.C. § 3-109 cmt. 1

11   (2002) ("An instrument that is payable to an identified person cannot be negotiated without the

12   indorsement of the identified person.").   As a consequence, when a party can show it is an

13   "identified person" by the "negotiation" of a note to it, and to each of its predecessors, it may

14   enforce the note as a "holder."  *Leyva*, 255 P.3d at 1280.

15         There is an alternate way in which an entity or person can become a holder.  If an

16

17         [31]For reasons unknown, the Nevada version of Article 3 spells the term "endorsement," while the
     Official Version of Article 3 uses "indorsement."  *Compare* U.C.C. § 3-204(a) (2002) (defining
18   "indorsement") *with* NEV. REV. STAT. § 104.3204(1) (2011) (defining "endorsement").  As noted by
     Professor John Krahmer,
19
           Either spelling can be considered correct. Despite the statutory usage, banks continue to
20         stamp checks as "P.E.G.," standing for "Prior endorsements guaranteed." As explained in
           *Perini Corp. v. First Nat'l Bank of Habersham*, 553 F.2d 398, 401 n.1 (5th Cir. 1977),
21         "[t]his practice could be attributed to the bankers' understandable reluctance to stamp 'Pay
           any Bank PIG' on the backs of the checks they handle."
22   John Krahmer, *Uniform Commercial Code Issues and Developments: 2010-2011 UCC Update*, 65
23   CONSUMER FIN. L.Q. REP. 64, 64 n.2 (2011).

24         [32]The presumption that a signature was made for the purpose of endorsement is strong; "regardless
     of the intent of the signer, a signature and its accompanying words are an endorsement unless the
25   accompanying words, terms of the instrument, place of the signature, or other circumstances
     unambiguously indicate that the signature was made for a purpose other than endorsement."  NEV. REV.
26   STAT. § 104.3204(1) (2011).

1  instrument is endorsed "in blank," it becomes a bearer instrument, meaning that anyone who

2  possesses or "bears" it is its holder.  NEV. REV. STAT. § 104.3205(2) (2011).  And if a bearer

3  instrument, it can be "negotiated by transfer of possession alone . . . ."  *Id.*

4        Whether the Note was specially endorsed to Fannie Mae or endorsed in blank thus becomes

5  a critical issue.  As previously indicated, at the Evidentiary Hearing the court was able to examine

6  the Note.  On the front of the First Allonge, affixed to the last page of the Note as originally

7  executed, was the following:

8                             **Pay to the order of**
                              AmTrust Bank

9                             **without recourse**
                         Prem Mortgage, Inc.

10

11                    **By:**[*Handwritten Signature of Vera Logvynets*]
                         Vera Logvynets

12                    **Authorized Agent by POA for**
                         Prem Mortgage, Inc.

13

14                  Cleveland, Ohio _____ 20 __
                  PAY TO THE ORDER OF

15              Federal National Mortgage Association
                     Without Recourse

16                        AmTrust Bank
                  FKA Ohio Savings Bank

17            By: [*Handwritten Signature of Vera Logvynets*]
                     Vera Logvynets
                      Authorized Agent

18

19  (Seterus Ex. B at 4.)  It is hand-signed (not stamped)[33] by Vera Logvynets on behalf of Prem

20  Mortgage and AmTrust.

21        Both endorsements—from Prem Mortgage to AmTrust and from AmTrust to Fannie

22  Mae—are special endorsements, the latter rendering the Note payable to the order of Fannie Mae.

23  _____

24      [33]Although it could have been stamped, as that manner of signature is explicitly recognized by the
UCC.  U.C.C. § 3-401(b) (2002); NEV. REV. STAT. § 104.3401(2) (2011) ("A signature may be made

25  manually or by means of a device or machine, and by the use of any name, including a trade or assumed
name, or by a word, mark, or symbol executed or adopted by a person with present intention to authenticate

26  a writing.").

*Id.* § 104.3205(1). Whenever Fannie Mae, or its agent, took possession of the Note, negotiation to Fannie Mae was complete and Fannie Mae became the Note's holder and thus a "person entitled to enforce." *Id.* §§ 104.3201(2), 104.3301.

The parties dispute if and when Seterus took possession of the Note and First Allonge. Phillips argues that Seterus's failure to attach the Note and First Allonge to the Proof of Claim proves that Seterus did not possess the First Allonge at that time, and that it "probably [was] created after the Proof of Claim was filed." (Dkt. No. 79 at 16.) Phillips also argues that the FNMA Trust (or, more specifically, its investors) possesses the Note. (*Id.* at 15.)

Seterus counters that Jolly's testimony established that Seterus has possessed the Note and First Allonge since July 1, 2010. (Dkt. No. 77 ¶¶ 17–18, 23.) Jolly testified that (i) it is common practice for Seterus to take possession of an original note and deed of trust once Seterus becomes the servicer; (ii) Seterus obtained servicing rights to, and possession of, the Note on July 1, 2010; and (iii) Seterus currently possesses the Note. (Hr'g Tr. 74:20–21, 82:10–12, 97:10–24, 121:19–23.) Moreover, Seterus produced the original Note (with both allonges affixed) at the Evidentiary Hearing. (*Id.* at 84.) The court credits Jolly's testimony and Seterus's production of the original Note to find that Seterus possessed the Note when the bankruptcy petition was filed.

Seterus, as Fannie Mae's undisputed authorized agent, possesses the Note on Fannie Mae's behalf—rendering Fannie Mae the Note's holder and a person entitled to enforce the Note[34]—and Seterus thus not only has standing to file and prosecute the Proof of Claim, it has established its entitlement to collect the amounts owing under the Note under nonbankruptcy law. The claim is thus allowed in the amount filed.

---

[34]Phillips's argument that Seterus cannot be the holder (which the court also understands to be an argument that Fannie Mae cannot be the holder) because there is a "broken" chain of title—more precisely, that because Chase formerly serviced the Note, Chase should appear in the chain of endorsements—fails. As a servicer, Chase acted only as an agent for the Note's then-holder. Moreover, Chase is not a party to this action; it is not asserting that it has standing or attempting to enforce the Note. Accordingly, Chase need not appear in the chain of endorsements.

b.    *Validity of the Endorsement [Herein of Vera Logvynets's Signature]*

Phillips argues, however, that Logvynets was not authorized to endorse the Note.  (Dkt. No. 79 at 2–3.)  Phillips first contends that Seterus was required to introduce written proof of Logvynets's agency relationships with Prem Mortgage and AmTrust because agents negotiating an interest in real property must have written authority.  (*Id.*)  She is correct on the law—the Nevada Statute of Frauds provides that an agent conveying interests in real property must have written authority to do so.  NEV. REV. STAT. § 111.205(1) (2011).  Negotiation of a promissory note, however, does not convey an interest in real property.  *Hofhines v. BAC Home Loans Servicing, L.P.*, 2012 WL 3440458 at *6 (D. Idaho 2012) ("[A] promissory note is not an instrument conveying or affecting an interest in real property but instead a promise to repay the loan and is not subject to the [Idaho Statute of Frauds].");[35] *see also In re Columbia Pac. Mortg.*, 20 B.R. 259, 263 (Bankr. W.D. Wash. 1981).  Thus, the Nevada Statute of Frauds is inapplicable.

Phillips next argues that the allonges were not properly affixed to the Note, and thus cannot be considered effective to have negotiated the Note.  But upon physical examination, it was evident that the two allonges were affixed to the Note by a staple, and were thus "part of the [Note]."  NEV. REV. STAT. 104.3204(1) (2011); *see In re Weisband*, 427 B.R. 13, 19 (Bankr. D. Ariz. 2010).

Phillips also argued that the two allonges were inadmissible because Seterus did not meet the business records exception to hearsay for them under Evidence Rule 803(6).  The endorsements are not hearsay, however, as the significance of an endorsement is that it was made, not that the words used are themselves true.  *See* FED. R. EVID. 801(c)(2); 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 801.11[1] (2d ed. 2012).  Here, each endorsement contains the words "pay to the order of" and indicates a specified person to be paid and a signature.  As set forth above, each endorsement is therefore a special endorsement.  NEV. REV. STAT.

---

[35]The relevant provision of the Idaho Statute of Frauds is, in pertinent part, identical to the Nevada provision cited by Phillips.  IDAHO CODE ANN. § 9-503 (2011); NEV. REV. STAT. § 111.205(1) (2011).

1   § 104.3205(1) (2011).  Special endorsements are verbal acts (also known as statements of legal

2   consequence) that negotiate a negotiable instrument.  *See U.S. v. Pang*, 362 F.3d 1187, 1192 (9th

3   Cir. 2004) ("A check is a negotiable instrument, a legally operative document, and falls within the

4   category of 'verbal acts' which are excludable from the hearsay rule. . . . Checks themselves,

5   together with the tellers' markings and routing stamps, . . . are commercial events which create

6   rights and obligations, and therefore no exception to hearsay need be found to admit checks into

7   evidence." (internal quotation marks and citations omitted)); NEV. REV. STAT. §§ 104.3201,

8   104.3204 (2011); WEINSTEIN'S FEDERAL EVIDENCE, *supra*, § 801.11[3].  In other words, it does

9   not matter whether Vera Logvynets subjectively intended to negotiate the Note.  It only matters that

10  the words—her signature and "pay to the order of"—were "said" (i.e., printed or written).

11          The only remaining issues are whether Logvynets had the authority to sign and whether her

12  signature is authentic, both of which the court resolves in the affirmative.  Phillips contends that

13  Seterus was required to introduce the power of attorney granting Logvynets the authority to sign as

14  Prem Mortgage's agent because of the specific language of the first endorsement.  Phillips

15  concedes that a signature on a negotiable instrument is presumed to be both authentic and made by

16  an authorized party, but argues that such presumption does not extend where the "alleged authority

17  is expressly dependent on a Power of Attorney that was never produced by Seterus." (Dkt. No. 79

18  at 3 (citing NEV. REV. STAT. § 104.3308 (2011)).)  This is a challenge to the first

19  endorsement—from Prem Mortgage to AmTrust—which states that Logvynets was an "Authorized

20  Agent by POA for Prem Mortgage, Inc." (Seterus Ex. B at 4.)  In short, Phillips argues that "by

21  Power of Attorney" is a magic phrase that somehow negates the statutory presumption of authority.

22          In spite of her concession, Phillips misapprehends the law governing negotiable

23  instruments.  The relevant statutory language is instructive:

24          In an action with respect to an instrument, the authenticity of, and authority to make,
            each signature on the instrument is admitted unless specifically denied in the
25          pleadings.  If the validity of a signature is denied in the pleadings, the burden of
            establishing validity is on the person claiming validity, but the signature is *presumed*
26          to be authentic and authorized . . . .

24

U.C.C. § 3-308(a) (2002); Nev. Rev. Stat. § 104.3308(1) (2011) (emphasis supplied).  Under the UCC, the term "presumed" has a special and set meaning.  Section 1-206 of the UCC states:

> Whenever the Uniform Commercial Code creates a "presumption" with respect to a fact, or provides that a fact is "presumed," the trier of fact must find the existence of the fact unless and until evidence is introduced that supports a finding of its nonexistence.

U.C.C. § 1-206 (2001).  This section has been adopted in Nevada.  Nev. Rev. Stat. § 104.1206 (2011).

The interaction between UCC § 3-308 and the definition of "presumed" in § 1-206 is explained by the official comment to § 3-308.  That comment states:

> "Presumed" is defined in Section 1-201 and means that *until some evidence is introduced which would support a finding that the signature is forged or unauthorized, the plaintiff is not required to prove that it is valid.*  The presumption rests upon the fact that in ordinary experience forged or unauthorized signatures are very uncommon, and normally any evidence is within the control of, or more accessible to, the defendant.  *The defendant is therefore required to make some sufficient showing of the grounds for the denial before the plaintiff is required to introduce evidence.*  The defendant's evidence need not be sufficient to require a directed verdict, but it must be enough to support the denial by permitting a finding in the defendant's favor.  *Until introduction of such evidence the presumption requires a finding for the plaintiff.*

U.C.C. § 3-308 cmt. 1 (2002) (emphasis supplied).  *See also B & C Enters. v. Utter*, 498 P.2d 1327, 1328–29, 88 Nev. 433, 435 (1972).

As stated in White and Summers, "merely by producing a properly indorsed or issued instrument the plaintiff proves that he is entitled to enforce it as a holder." 2 James J. White & Robert S. Summers, Uniform Commercial Code § 16.4.b (5th ed. 2008).   Believing that Seterus had to establish Logvynets's authority to sign, Phillips introduced no evidence, let alone "some evidence . . . which would support a finding that [Logvynets's] signature [was] forged or unauthorized." U.C.C. § 3-308 cmt. 1 (2002).  The inclusion of the term "by Power of Attorney" on the endorsement did not alter Phillips's burden of production.  In short, under NRS 104.3308, she has failed to carry *her* burden.

Phillips seems to argue that showing that the Proof of Claim lacked a copy of the Note and

25

First Allonge satisfies her burden of showing fraud or forgery. (*See* Dkt. No. 79 at 15–16.) The argument appears to be since they were not produced at filing, and since the Proof of Claim was never amended formally, the subsequent appearance of the First Allonge in the relief from stay action means that it was forged at some point in between.

This sequence of events, however, does not constitute a threshold showing of fraud or forgery. Seterus's Proof of Claim on Fannie Mae's behalf was filed on January 30, 2012, and admittedly did not include the Note or First Allonge. (*See* P.O.C. No. 3-1.) But the motion to lift stay *does* attach copies of the Note and First Allonge, and it was filed on March 21, 2012, long before Phillips objected to the Proof of Claim. (Dkt. No. 18.) Indeed, without ever inspecting the Note, Phillips objected to the endorsements as a rogue or fugitive allonge, so it is undisputed that Phillips knew about the endorsements long before she sought to challenge them.[36]

The evidence established that Seterus, at worst, neglected to copy the Note and the First Allonge when it filed the Proof of Claim. Although alerted to the omitted endorsements, Phillips failed to produce any evidence that would tend to show that the First Allonge was forged or fraudulent.[37] Under NRS 104.3308, the endorsements on the First Allonge are presumed valid, and Seterus's claim is deemed allowed as filed.

### 3.     *The Relief from Stay Motion*

In addition, as Fannie Mae is the Note's holder and Seterus is Fannie Mae's agent—a fact not in dispute as set forth above—Seterus has established the requisite colorable claim to receive

---

[36]Given that Phillips had a copy of the First Allonge long before she filed her objection to the Proof of Claim, the court does not have a problem with incorporating Rule 7015 to this contested matter. Given Phillips's advance knowledge, there was no prejudice in considering the Proof of Claim to be amended to conform to the proof. Consequently, the Proof of Claim is presumptively valid under Rule 3001(f).

[37]Phillips tried to show late creation of the First Allonge through cross-examination of Kathy Jolly, Seterus's representative. This evidence was inconclusive at best. Against this background, the court is prepared to believe that it is more likely that Seterus negligently failed to copy the Note and First Allonge when it filed its Proof of Claim rather than that it forged the First Allonge later on. In short, when both are equally likely, the court picks sloth over venality.

payment pursuant to the Note, and thus has made a sufficient showing to sustain its standing for relief from stay. *In re Veal*, 450 B.R. at 913. And as Phillips has not introduced any evidence on her ability to reorganize if Seterus's claim were allowed in its full amount—an issue upon which she bears the burden of proof under Section 362(g)(2)—her lack of equity in the Property, *see supra* Section I.B.3, means that Seterus should prevail on its motion for relief from stay if the Note is secured by interest in the Property.

### 4.    *Whether the Claim is Secured*

Even though Seterus's claim under the Note is an allowed claim, that does not necessarily mean that it is allowed as a *secured* claim. Finding that Seterus is a person entitled to enforce establishes only that Seterus's principal, Fannie Mae, is entitled to the amount stated in the Proof of Claim (and that Phillips gets credit against the Note for all amounts paid to Fannie Mae or Seterus); it does *not* establish that the Note is secured by the Property. That can only be determined by reviewing Nevada law on real property security. Accordingly, Phillips challenges Seterus's status as a secured creditor with respect to the Note, alleging deficiencies in the Assignment and that Phillips, Prem Mortgage, and MERS intended to split the Note and Deed of Trust at inception and to disallow reunification. (Dkt. No. 79 at 10–13.)

In particular, Phillips argues that "[w]ithout a proper Assignment of the Deed of Trust, Seterus has no standing to proceed with any foreclosure against the property." (*Id.* at 10.) Phillips leaps from the flawed premise that the purportedly defective Assignment defeats Seterus's standing to foreclose[38] to the conclusion that the Note is "unenforceable against the Debtor and the Debtor's property." (*Id.* at 12.) Essentially, Stanley conflates the claim at issue here with the security for that claim. This is incorrect.

With respect to the status of the claim as secured, Section 502 provides that when a party in interest has objected to a proof of claim, "the court . . . shall allow [a claim for which a proof of

---

[38]*See supra* note 16.

claim is filed] except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured . . . ." 11 U.S.C. § 502(b)(1) (2012). The court thus turns to state law to decide whether, as Phillips contends, Seterus has lost the security for its claim against her.

Before examining Nevada law in detail, a brief review of the facts is again in order. Seterus is Fannie Mae's agent and possesses the Note. The Note is specially endorsed to Fannie Mae, and thus Fannie Mae is the holder. Fannie Mae is the beneficiary of the Deed of Trust under the Assignment. The result is that Fannie Mae holds both the Note and all beneficial interests under the Deed of Trust, and did so before Phillips commenced her case.

Is this combination of facts sufficient to confer secured status on Seterus? A recent Nevada Supreme Court decision indicates that it is. *Edelstein*, 286 P.3d 249. In *Edelstein*, the Nevada Supreme Court held that "to have standing to foreclose, the current beneficiary of the deed of trust and the current holder of the promissory note must be the same." *Id.* at 255. Here, Fannie Mae is the current beneficiary of the Deed of Trust, satisfying the first element of *Edelstein*. Fannie Mae is also the current holder of the Note, even though the Note is in Seterus's possession. *See supra* Section II.A. Thus, the second element of *Edelstein* has been met, and Seterus has established that it has standing under Nevada law as a secured creditor with the Property as collateral.

Phillips counters that the Assignment was invalid on two grounds. First, it named Fannie Mae as the assignee yet Fannie Mae had already transferred its interest in the Note to the FNMA Trust; second, it occurred after the closing date of the FNMA Trust. (Dkt. No. 79 at 10–11.) She seems to argue that a deed of trust assignment to a party that has no interest in the related promissory note is invalid.

At the hearing, Phillips offered McCaffrey's testimony to prove that the FNMA Trust exists and that it "owns" and "possesses" the Note.[39] (Hr'g Tr. 30:5–8, 49:2–6.) The court rejected this

---

[39]*See supra* note 10.

1    testimony because of McCaffrey's lack of personal knowledge.  Other than the testimony, which

2    relied upon information generally available to the public and an "audit" that McCaffrey had

3    allegedly produced, but were not before the court, there was no extrinsic evidence to prove any of

4    the allegations concerning the FNMA Trust.  (*Id.* at 39:3–5, 49:2–6.)  On cross examination,

5    McCaffrey even admitted that notes and deeds of trust are regularly transmitted into a securitized

6    trust after the closing date.  (*Id.* at 46:17–22; 48:19–49:1.)  Next, whether or not the assignee of a

7    deed of trust assignment has a concurrent interest in the promissory note is irrelevant.  The

8    documents, and their respective interests, survive even if held by different parties.  *Edelstein*, 286

9    P.3d at 259 ("Separation of the note and security deed creates a question of what entity would have

10   authority to foreclose, but does not render either instrument void." (internal quotation marks and

11   citation omitted)).

12         Second, Phillips contends the Assignment was invalid because "the Deed of Trust states

13   that the Note . . . *may* be sold 'together with' the Deed of Trust." (Dkt. No. 79 at 11 (emphasis

14   added).)  Phillips's own language defeats her argument.  The instruments *may* be sold together;

15   there is nothing in the Deed of Trust to indicate that the failure to convey them together defeats an

16   assignment of only the Deed of Trust.  (*See* Seterus Ex. A.)  Also, *Edelstein* expressly held that a

17   MERS deed of trust assignment concurrently transfers[40] the related note, so long as MERS is the

18   nominee (agent) of the party that owns the relevant interest in that note (generally, the lender and its

19   successors and assigns).  286 P.3d at 260.

20         Accordingly, the Assignment was valid.

21         Phillips next contends that language in the MERS Systems Procedures Manual (Phillips Ex.

22   B) and the MERS System Terms & Conditions (Phillips Ex. C) (collectively, the "MERS

23   Documents") evinces an intent by the parties to the initial transactions (Phillips, Prem Mortgage,

24   and MERS) to disallow reunification of the Note and Deed of Trust.  (Dkt. No. 79 at 12–13.)

25   _____

26         [40]*See supra* note 2.

29

1   Moreover, she asserts, the MERS Documents prohibit MERS from conveying any interest in the

2   Note. (*See id.*) The MERS Documents state that "MERS and the Member agree that . . . the

3   MERS System is not a vehicle for creating or transferring beneficial interests in mortgage loans"

4   and "MERS cannot transfer the beneficial rights to the debt. The debt can only be transferred by

5   properly endorsing the promissory note to the transferee." (Phillips Exs. B, C.) As a consequence,

6   Phillips argues, the separation remains and the debt is unsecured. *Edelstein*, however, rejects

7   Phillips's theory.

8          In *Edelstein*, the Nevada Supreme Court had to decide whether a loan structure nearly

9   identical to the one at issue here irrevocably split the note and deed of trust so that the note became

10  unsecured. 286 P.3d at 252–53. A lender had made a loan secured by a Nevada residence, and

11  named MERS as the beneficiary under the deed of trust. *Id.* The note was later negotiated through

12  various entities, and eventually was endorsed in blank on an allonge affixed to the note. *Id.* At the

13  relevant times, it was held by ReCon Trust Company, N.A. (a subsidiary of Bank of America), as

14  agent for Bank of New York Mellon. *Id.* The deed of trust was transferred as well, ultimately

15  being assigned to Bank of New York Mellon. *Id.*

16         Against this background, the Nevada Supreme Court summarized its holding:

17         In determining whether the party seeking to foreclose in this case met those
           requirements, we also address whether, as is argued here, the designation of
18         Mortgage Electronic Registration System, Inc. (MERS)[] as the initial beneficiary of
           the deed of trust irreparably splits the promissory note and the deed of trust so as to
19         preclude foreclosure. We conclude that when MERS is the named beneficiary and a
           different entity holds the promissory note, the note and the deed of trust are split,
20         making nonjudicial foreclosure by either improper. However, any split is cured
           when the promissory note and deed of trust are reunified. Because the foreclosing
21         bank in this case became both the holder of the promissory note and the beneficiary
           of the deed of trust, we conclude that it had standing to proceed through the
22         [Foreclosure Mediation Program].

23  *Id.* at 252.

24         More specifically, *Edelstein* adopted the approach of the *Restatement*, which in turn states

25  that "a transfer of a [deed of trust] also transfers the obligation the [deed of trust] secures unless the

26  parties to the transfer agree otherwise." *Id.* at 260; RESTATEMENT (THIRD) OF PROPERTY:

30

1   MORTGAGES § 5.4(b) (1997).  Such agreement is not shown by the MERS Documents, which

2   appear to bind only MERS and the "Member."  (Phillips Exs. B, C.)  By the language of the

3   exhibits, a member appears to be a financial institution that participates in MERS's internal system

4   of document tracking.  (*See id.*)  Phillips does not seem to be a member and was not bound by the

5   MERS Documents.  In addition, the MERS Documents were not attached to the Deed of Trust, nor

6   were they incorporated by reference.  (*See* Seterus Ex. A.)

7        More importantly, the specific language of the Deed of Trust overrides the general

8   boilerplate language of the MERS Documents.  *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095,

9   1099 (9th Cir. 2006) ("Specific terms of a contract govern inconsistent, more general terms.");

10  RESTATEMENT (SECOND) OF CONTRACTS § 203(d) (1981) ("[S]eparately negotiated or added terms

11  are given greater weight than standardized terms or other terms not separately negotiated.").  The

12  Deed of Trust states that

13        MERS holds only legal title to the interests granted by Borrower in this Security
          Instrument, but . . . MERS (as nominee for Lender and Lender's successors and

14        assigns) has the right: to exercise any or all of those interests, including, but not
          limited to, the right to foreclose and sell the Property; and to take any action

15        required of Lender . . . ."

16  (Seterus Ex. A.)  *Edelstein* interpreted identical language and determined that it grants MERS the

17  right to convey the lender's interest in the Note.  286 P.3d at 252, 260.  The court will not

18  supercede the Nevada Supreme Court's interpretation of the precise language at issue with

19  boilerplate from documents that were not even incorporated into the Deed of Trust.

20       In short, the MERS Documents Phillips points to are irrelevant; the parties did not agree to

21  disallow reunification.  Consequently, the instruments were reunified in Fannie Mae once (i)

22  Fannie Mae became a holder of the Note, by operation of the special endorsement from AmTrust

23  and constructive possession through Seterus; and (ii) Fannie Mae acquired the beneficial interest in

24  the Deed of Trust by operation of the Assignment from MERS.

25       Given the isomorphism between the facts in *Edelstein* and the facts here, there can be no

26  doubt that Phillips's claim is not well taken under Nevada law.  As Phillips has not raised any

31

additional issues of possible invalidity with respect to the Deed of Trust or the Assignment, they will be taken as valid. The result is that Seterus's claim is secured by the Property.

**III.    CONCLUSION**

For the reasons set forth above, the court hereby overrules Phillips's objection to Seterus's Proof of Claim. Seterus has an allowed secured claim in the amount set forth therein.

In addition, Seterus has established that it is entitled to relief from stay as to the Property, and the court hereby grants that relief.

This order constitutes the court's findings of fact and conclusions of law under Rule 7052, made applicable here by Rule 9014(c). The court will enter separate orders disposing of each motion.

Copies sent to:
CM/ECF ELECTRONIC NOTICING
BNC MAILING MATRIX

# # #